## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| **ORLANDO TORAH CENTER, INC.,**<br><br>                              Plaintiff,<br><br>**v.**<br><br>**ORANGE COUNTY, FLORIDA and THE ORANGE COUNTY BOARD OF COUNTY COMMISSIONERS,**<br><br>                              Defendants. | Case No.  6:25-cv-1463 |

## COMPLAINT

Plaintiff ORLANDO TORAH CENTER, INC. ("Plaintiff" or "OTC"), files this Complaint against Defendants ORANGE COUNTY, FLORIDA (the "County"), and THE ORANGE COUNTY BOARD OF COUNTY COMMISSIONERS (the "BCC") (collectively, the County and BCC shall be referred to as "Defendants") and states:

## INTRODUCTION

1.     This action involves Defendants' unconstitutional deprivation of OTC's fundamental rights of religious exercise and expression, and right to be free from religious and racial discrimination, as a result of Defendants' denial of OTC's ability to continue as a functioning Jewish house of worship in an area of Orange County

informally known as "Church Row."[1]

2.    OTC seeks to redress violations of its civil rights resulting from Defendants' burdensome, discriminatory, unreasonable, and standardless land use regulations and intentional conduct that have prohibited, and continue to prohibit, OTC from using real property as a house of worship on a parcel of land located in Orange County, Florida, as protected by:

a. The Free Exercise and Free Speech Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983;

b. The Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc, *et seq.* ("RLUIPA");

c. 42 U.S.C. § 1982;

d. The Florida Religious Freedom Restoration Act, Fla. Stat. §§ 761, *et seq.* ("FRFRA"); and

e. Article I, Section 3 of the Florida Constitution.

3.    OTC further challenges the County's zoning ordinance, which unconstitutionally provides unbridled discretion to government officials to decide whether houses of worship may locate in certain zoning districts in Orange County.

4.    On or about May 20, 2024, OTC applied to the Orange County Board of Zoning Adjustment ("BZA") and subsequently appealed to the BCC for a Special

---

[1] The moniker "Church Row" derives from the high density of religious buildings in a relatively small area.

Exception and a Variance so that OTC could use and expand an existing synagogue on the property it owns at 8613 Banyan Boulevard, Orlando, Florida 32819 ("the Property"). Ultimately, on July 1, 2025, the BCC denied that application.

5.      The zoning proceedings on OTC's land use application were characterized by false statements from the public demonstrating animus toward Orthodox Jews, and the County decisionmakers were responsive to those statements instead of focusing on the statutory land use criteria applicable to OTC's application.

6.      The hostility against OTC was substantially aimed at the growth of the Orthodox Jewish community in the Sand Lake Hills neighborhood of Orange County.

7.      Defendants have intentionally targeted OTC's religious exercise and speech within the County, enforcing the County's unconstitutional zoning ordinance to frustrate OTC's attempts to expand its existing synagogue as necessary to effectuate its religious mission.

## **PARTIES**

8.      Plaintiff ORLANDO TORAH CENTER, INC. is a Florida tax-exempt not-for-profit corporation.

9.      OTC is a religious assembly and institution, as that term is used in 42 U.S.C. § 2000cc(b)(1).

10.     Defendant ORANGE COUNTY, FLORIDA, is a municipal corporation of the State of Florida, having offices at 201 South Rosalind Avenue, Orlando, Florida 32801.

11.     Defendant ORANGE COUNTY BOARD OF COUNTY

COMMISSIONERS is a municipal agency organized pursuant to the Orange County Code § 38-23, with its principal place of business at 201 South Rosalind Avenue, Orlando, Florida 32801 in Orange County.

12.     Each of these Defendants is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(A).

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction based on 28 U.S.C. § 1331 (federal question jurisdiction) as this action is brought under 42 U.S.C. §§ 2000cc, *et seq.*, 42 U.S.C. § 1982, 42 U.S.C. § 1983, and 28 U.S.C. § 2201. This Court also has supplemental jurisdiction over Counts IX, X, and XI under 28 U.S.C. § 1367(a) for the claims under Florida law.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as all the events giving rise to the claims occurred in this district—and specifically in this Division—and Defendants are subject to personal jurisdiction in this district.

## FACTUAL BACKGROUND

### A.     OTC was Founded as a Neighborhood Synagogue

15.     OTC was founded in 2011 with the mission of creating a vibrant religious community centered on traditional, sometimes called "Orthodox," Jewish worship.

16.     Historically, Orlando has not had a large Orthodox Jewish community, but the number of individuals practicing Orthodox Judaism in Orlando has grown in recent years.

17.     OTC is a synagogue that seeks to support a full range of Orthodox Jewish

practice, including prayer, fellowship, religious education, religious lifecycle events, and opportunities for celebrating Jewish holidays as a community.

18.    Traditional Jewish practice requires that men say certain prayers, which may only be said within a *minyan*, a group of ten Jewish adult men of sound mind.

19.    In 2011, a minyan began meeting on weekdays in a commercial storefront near Universal Studios that was leased by another local Jewish group.

20.    On the Shabbat (Sabbath) and non-driving holidays, some individuals who were within walking distance met for prayer services in a rented home.

21.    About a year later, OTC rented a house in the Sand Lake Hills neighborhood in Orange County. A regular attendee of OTC's prayer services lived in that house as his personal residence.

22.    On April 2, 2015, OTC purchased the Property. That Property is the subject of this litigation.

23.    At the time OTC purchased the Property, it was a residential property not in good repair. OTC renovated the Property.

24.    OTC's renovations included a near-gut renovation and large addition to the living room and dining room. The Property remained residential in nature.

25.    In the fall of 2017, a regular attendee of OTC's services moved in to the Property and used it as his personal residence.

26.    In 2022, the Property was legally converted from a residential home to a dedicated house of worship with Orange County's approval.

**B.**      **As OTC's Congregation Grew, the Property Struggled to Accommodate Its Religious Worship**

27.      OTC began conducting daily morning prayers for minyan participants, or "*minyanim",* as well as evening prayers, each lasting approximately one hour, from Sunday through Friday at the Property.

28.      OTC also began holding a Thursday evening study session for adults at the Property.

29.      Additionally, OTC began conducting prayer services at the Property on the Shabbat, the primary day of Jewish communal worship, which last several hours in the morning and early afternoons on Saturdays.

30.      As a neighborhood synagogue, OTC's location is critical to its congregants' observance of the Shabbat because traditional Judaism prohibits driving on the Sabbath and most Jewish holidays, which last from sundown on Friday (or the night before the holiday) until approximately an hour and a half after nightfall on Saturday (or on the evening of the holiday). Congregants must attend religious services at a house of worship within walking distance in order to adhere to religious tenets.

31.      Because OTC's congregants cannot drive to synagogue on the Sabbath and on many Jewish holidays, OTC must provide a synagogue that is close to its congregants' homes. As such, most of OTC's congregants live in the Sand Lake Hills neighborhood in Orange County.

32.      OTC's congregation has more than doubled in the last five (5) years.

33.      OTC and its congregants' religious exercise now suffers significantly due

to the Property's limited capacity for its religious practices.

**C.    *OTC Congregants' Ability to Worship is Inhibited and Observing Prayers and Rituals Central to Their Religious Observance is Inhibited***

34.    The Property's existing sanctuary space cannot accommodate OTC's congregation, and does not provide enough room for everyone to sit. As a result, the religious exercise of worshippers at OTC has been significantly affected by the lack of space, which impinges on their ability to worship. It has also affected whether they attend religious services at all.

35.    The religious experience of OTC's attendees is significantly diminished by the lack of space in the sanctuary, since the overcrowding prevents worshippers from focusing on the prayers and detracts from the worshipful atmosphere.

36.    The current layout of the Property's physical space does not include any separation between the front door and the worship space, so the worship is disrupted any time the front door is opened.

37.    Additionally, all indoor space in the Property is used for adult religious worship, other than two small rooms used for office and storage space.

38.    The current sanctuary space does not allow OTC to hold children's services, which would allow children to learn prayers and study Torah within the synagogue and prepare them for adulthood as Jews.

39.    The lack of an adequate facility interferes with OTC's ability to engage in the exercise of Kiddush, which is a religiously and culturally significant blessing and

7

practice in the Jewish religion.[2] For example, if a family with young children desires to bring them to the synagogue, to celebrate the Sabbath or a Jewish holiday with adults who can attend prayers, or for a parent who has not attended but arrives while prayers are ongoing, there is nowhere for these synagogue attendees to wait inside the building for Kiddush.

40.     These circumstances pose a significant hardship for individuals attending the synagogue, especially for those who have already walked in the Florida summer heat or in rain.

41.     Currently, the only space to set up the Kiddush is outside, regardless of the weather. This means that families must choose between not attending or standing in the Florida heat and rain to partake in this religious exercise.

42.     Further, there is not currently private space at the Property for mothers of young children to nurse. As a result, nursing mothers must forego attending prayer services and the women's study session held during Kiddush if they need to feed their babies.

43.     Also, the Property lacks sufficient space for teens in the congregation to

---

[2] Kiddush, which literally means "sanctification" in Hebrew, is both the blessing said over wine, and a communal gathering following Shabbat morning services at a synagogue, and it is religiously and culturally significant for OTC. Kiddush is an opportunity for individuals to engage in conversation with their spiritual mentors, for children to identify the synagogue as their spiritual center and home, and for attendees to strengthen religious involvement and community fellowship. When Kiddushim are sponsored, as they frequently are to commemorate important lifecycle events such as the *yahtzeit* (memorial of a relative's passing) or a *bar mitzvah* or *bat mitzvah* (coming of age of a boy or girl), the Kiddush takes on even greater religious significance.

explore their Jewish identity in their own space with specialized programs, connect with peers, and otherwise grow into knowledgeable and engaged religious community members.

44.     OTC's current facilities also lack a *mikvah*, which is a traditional Jewish bath that is used for ritual immersion, and is considered so important that a Jewish community is required to construct a kosher mikvah even before building a synagogue.

45.     The closest mikvah to the Sand Lake Hills community is in North Orlando, which is 40 minutes away by automobile.

46.     Because the mikvah is so far away, OTC's members are unable to go to a mikvah on the Sabbath or holidays.

47.     There is no other Orthodox synagogue within reasonable walking distance of Sand Lake Hills.

48.     Upon information and belief, the only other synagogue offering Orthodox Jewish prayer services in the County is affiliated with a different Jewish movement, offers a different style of prayer, and is more than two (2) miles away from OTC.

49.     Due to insufficient space, OTC must limit or cancel various other religious programs it seeks to offer. These include its youth programs, Shabbat groups, holiday events, and weekly religious education, all of which are essential to its religious mission.

50.     Educating children is an important aspect of OTC's religious mission. Children must learn to read Hebrew in order to be able to read and recite Jewish

prayers and to be able to study Torah and other classical Jewish texts in their original language.

51.    OTC does not currently have a space for Hebrew education or religious instruction for children.

52.    In addition to the difficulties with welcoming children into its sanctuary, OTC is unable to provide youth services or youth groups.

53.    Youth services and youth groups are an essential part of educating the young about their faith and future religious obligations, which is an essential part of OTC's religious mission.

54.    OTC was recently forced to cancel a Rosh Hashanah children's program to learn about Jewish holidays because there was no space available for the program.

55.    OTC has not been able to run other children's programs centered on Jewish holiday learning and celebration due to lack of space.

56.    OTC no longer leases space to a tenant and instead uses the entire interior of the structure as its synagogue.

57.    This legal conversion from a residential home to a dedicated house of worship was approved by the County in 2022.

58.    OTC also lacks a commercial kitchen or indoor dining area for the celebration of Kiddush, traditionally an important aspect of Shabbat observance and celebration. OTC requires its own facilities for Kiddush in order to create a sense of community for its own congregation.

59.    OTC additionally runs a "Ladies Lecture" program on Saturdays that

must compete for space with Jewish learning occurring in the sanctuary, the Kiddush occurring outside, and a program that OTC also runs for small children on Saturday mornings.

60.    The result of the significant spatial constraints is a noisy, stressful, and chaotic atmosphere that detracts from these important religious activities, which are an important part of OTC's Sabbath programming.

61.    OTC desires to have a social hall where congregants may engage in customary Kiddush meals following Saturday morning services as well as to offer celebratory meals after lifecycle events such as a *brit milah, bar mitzvah,* or *bat mitzvah*.

62.    Moreover, within OTC's congregation, worship services differ for Jewish individuals whose cultural and ancestral backgrounds are in Eastern Europe ("Ashkenazi") versus North Africa and the Middle East ("Sephardic").

63.    OTC seeks to offer both Ashkenazi and Sephardic services in order to meet the needs of its congregation.

64.    However, the Property currently lacks space for the Ashkenazi and Sephardic services to occur concurrently, forcing the Sephardic service to meet elsewhere instead of the Synagogue.

65.    OTC believes that it needs to have a space that will accommodate the Sephardic worship practices of members of the congregation while maintaining a cohesive community feel.

66.    It is religiously important for the Sephardic services to be held in the synagogue because the services also need access to Torah scrolls, which cannot be

moved easily. Sephardic members of the OTC community have a religious obligation to pray according to their centuries-old traditions. If OTC cannot provide this opportunity, then it cannot meet the religious needs of its members.

67.    Currently, there is not sufficient space for lifecycle events such as *brit milah* to occur in the synagogue.

68.    The Property also lacks adequate storage space. The current space that would otherwise be used as the Rabbi's office has been converted, by necessity, to a storage space, which requires the Rabbi to meet with congregants amidst the storage while preventing him from using the space as an office.

69.    OTC does not have a place to store *lulavim*, which are essential for performing religious commandments associated with the Jewish holiday of Sukkot.

70.    OTC's current sanctuary space is located immediately within the building, without any separation for a vestibule and coat room. This means that individuals entering the building cannot be respectful of the ongoing prayer services. Newcomers often interrupt those praying in the sanctuary, which is disruptive to the overall prayer services.

71.    OTC desires to have a vestibule with a coat room before the entry into the sanctuary, which would allow newcomers to remain respectful of ongoing prayer services and would prevent interruption of and detraction from ongoing prayer services.

72.    Due to the limited office space, the ability to have pastoral counseling and private meetings with congregants is greatly diminished.

73.    OTC, as part of its religious exercise, also hosts the Orlando Community Kollel ("Kollel"), a group of men who study Jewish religious texts full time.

74.    Facilitating religious study is an important part of OTC's religious mission. The current building lacks a separate study space, so all study must occur in the sanctuary.

75.    Congregants and members of the Kollel must move chairs and tables back and forth, which detracts time and attention away from OTC's religious mission, both with respect to prayer services and religious study.

76.    The Kollel is open to all community members who desire to engage in *chavrusa* study, a form of partnered religious learning, which is a longstanding traditional method of religious study for Orthodox Jews.

77.    Orthodox Judaism teaches that religious study for adult men is foundational to Jewish practice and crucial to sustaining Jewish life.

78.    OTC's congregants participate in the Kollel to deepen their Jewish knowledge and understanding.

79.    As discussed below in paragraphs 161 through 170, the County's arbitrary limitation on the hours that OTC may operate limits the ability of community and Kollel members to engage in this learning.

80.    The Kollel also facilitates children's programming, which teaches children to become lifelong Jewish learners, an important part of OTC's religious mission.

81.    OTC lacks space for a library within the current building. Maintaining a library would allow OTC's congregants to borrow and refer to religious texts necessary to expand their study and religious understanding. A physical library is especially important on the Sabbath and Jewish holidays, during which the use of electronics (and accessing digital/electronic documents) is prohibited under Jewish law.

82.    OTC does not have space for any groups to meet outside of the main sanctuary space, which also hosts the Kollel.

83.    OTC has attempted to utilize existing garage space to alleviate the spatial constraints, but the garage becomes exceedingly hot and is not a reasonable alternative. Additionally, the garage space is not nearly sufficient to address OTC's need for substantial additional space.

84.    The spatial constraints at OTC are exacerbated on certain religious holidays, such as Rosh Hashanah.

85.    OTC has been forced to rent portable toilets because the existing space does not offer enough restroom facilities for the congregation.

86.    OTC also has a desire to increase security for its building, especially in light of an increase in antisemitic attacks on Jewish buildings following the massacre of Jewish civilians in Israel on October 7, 2023, and the politically charged subsequent wars.

87.    According to a recent ADL report, in Florida, 36% of the state's antisemitic incidents took place at Jewish institutions, double the same metric (18%) nationally. Florida is one of the ten (10) states with the most antisemitic incidents in

2024.[3] OTC is unable to provide necessary security within the layout of its current space, thereby creating a safety hazard for OTC's attendees.

88.    Congregants have told OTC's clergy that, due to inadequate facilities, they are not always able to attend services.

### D.    OTC'S Property, and Other Similar Uses on the Edge of the Sand Lake Hills Residential Neighborhood

89.    OTC purchased the Property, consisting of a single-family home on a 0.75-acre lot, on April 2, 2015.

90.    The lot is on a corner, bordered by South Apopka Vineland Road to the west (separated by a strip of unused land owned by the County), Banyan Boulevard to the south, and adjacent single-family homes to the north and east (see below):

---

[3]    ADL, Audit of Antisemitic Incidents 2024, *available at* https://www.adl.org/resources/report/audit-antisemitic-incidents-2024 (last visited July 28, 2025).



91.    South Apopka Vineland Road is a major roadway in Orlando, with the Florida Department of Transportation reporting an average daily trip count of 33,000 for the year 2024, the most recent year for which data is available. Functionally, it is classified as a "Principal Arterial – Other" roadway by the County.

92.    The County's functional classification of Banyan Boulevard is a "Major Collector."

93.    The single-family home on the Property consisted of 1,654 square feet, including three bedrooms, two bathrooms, a kitchen, and a living room.

94.    The Property was originally the model single-family home of the Orlando

16

subdivision commonly referred to as "Sand Lake Hills."

95.    Sand Lake Hills is a large community within the metropolitan Orlando area, comprising over 1,000 homes.

96.    Most of the Sand Lake Hills neighborhood, including the Property, is unincorporated and not subject to a homeowners association.

97.    The "Bay Hill" neighborhood is adjacent to Sand Lake Hills on the other side of South Apopka Vineland Road.

98.    There is a 7-Eleven convenience store and a medical facility within 2,000 feet of the Property.

99.    There are approximately thirteen (13) other religious institutions located on South Apopka Vineland Road.

100.    One of these is Christ Community Church, located at 5425 South Apopka Vineland Road.

101.    Two nonreligious institutional uses are located along Banyan Boulevard within the neighborhood, on the other side of Sand Lake Hills where Banyan Boulevard intersects the eastern border of Sand Lake Hills at Dr. Phillips Boulevard: (a) Southwest Middle School; and (b) The Learning Center of Dr. Phillips (see below):



102.   These uses are situated identically for relevant purposes to OTC's Property, at the edge of the neighborhood, along Banyan Boulevard, and surrounded by single family residential uses.

103.   Southwest Middle School, a public school, is located in Sand Lake Hills along Banyan Boulevard (see below).



104.    The land used to build Southwest Middle School had not been developed during the initial phase of housing development, with the developer planning to build either a school or more homes.[4]

105.    It was sold to the public school system in 1989.

106.    Like OTC, Southwest Middle School is located on the edge of the Sand Lake Hills, on Banyan Boulevard, and is bordered by a major road.

107.    Southwest Middle School, which was built after the construction of the surrounding homes in the Sand Lake Hills neighborhood, was required to obtain a special exception from the BZA.

108.    The BZA approved the special exception for Southwest Middle School on July 7, 1988, over the objections of neighbors. Southwest Middle School is

---

[4] The founder of "Residents United for Dr. Phillips," a community group opposed to the 2024 Application (on which the founder spoke despite living (5) five miles away from OTC), erroneously told the BZA that the land used to build Southwest Middle School and the Learning Center had been "excised out of the plat" when Sand Lake Hills was developed, but neither the deed nor the plats supports that contention.

approximately 165,000 square feet.

109.    The special exception included eight (8) conditions, including a maximum capacity of 1,275 students.

110.    Upon information and belief, Southwest Middle School has exceeded this enrollment capacity since at least 2016.

111.    Upon information and belief, the County has not issued any violations to Southwest Middle School nor taken any action against the Board of Education for failing to abide by the conditions of the special exception approval.

112.    Southwest Middle School also obtained a parking variance to provide 144 parking spaces in lieu of 375 that would be required under the Code.

113.    Southwest Middle School has access to both Banyan Boulevard and Dr. Phillips Boulevard.

114.    Traffic to and from the public school travels along Banyan Boulevard in front of the Property.

115.    Each day, school buses travel in front of the Property on Banyan Boulevard.

116.    Upon information and belief, a Christian church had recently been holding services at Southwest Middle School.

117.    OTC is unaware of any community complaints or County action taken with respect to this church.

118.    Upon information and belief, the Paris Saint-Germain Academy Orlando, a soccer camp, is also located at Southwest Middle School.

119.    OTC is also unaware of any community complaints or County action taken with respect to this camp.

120.    Upon information and belief, National Youth Sports Events, LLC, also operates a basketball program at Southwest Middle School.

121.    OTC is also unaware of any community complaints or County action taken with respect to National Youth Sports Events' program.

122.    The Learning Center of Dr. Phillips, a daycare center, is also located in Sand Lake Hills at 8004 Banyan Boulevard (see below).



8004 BANYAN BLVD, UN-INCORPORATED, FL 32819    3/22/2023 9:42 AM

123.    Upon information and belief, The Learning Center of Dr. Phillips has a capacity of 130 children.

124.    On or about December 4, 2014, the BZA granted a special exception to The Learning Center of Dr. Phillips to operate a day care center.

125.    Similar to OTC, the only entrance to The Learning Center of Dr. Phillips is from Banyan Boulevard.

126.    The Learning Center of Dr. Phillips has approximately 37 parking spaces.

127.    Prior to the development of the Learning Center of Dr. Phillips, a founding member of OTC had sought to purchase the land it is located on but was turned away.

*128.*    Traffic to and from the daycare also travels along Banyan Boulevard in front of the Property.

**E.    *The County's Land Use Regulations Imposed on OTC's Use of Its Property***

129.    The County regulates land use within its jurisdiction through the Orange County Land Development Code ("LDC").

130.    The LDC states: "No building or structure shall be erected and no existing building shall be moved, altered, added to or enlarged, nor shall any land, building, structure or premises be used or designed to be used for any purpose or in any manner other than a use designated in this chapter, or amendments thereto, as permitted in the district in which such land, building, structure or premises is located, without obtaining the necessary zoning and/or building permits and completing the work under those permits."

131.    The LDC empowers the County's zoning director to cure violations of the LDC by ordering "discontinuance of illegal use of land, buildings, or structures; removal of illegal buildings or structures or of additions, alterations, or structural

changes thereto; discontinuance of illegal work being done; or shall take any other action authorized by the zoning ordinance or this article to insure compliance with or to prevent violation of its provisions."

132.    Further, pursuant to the LDC, a violation may be punishable by "a fine not to exceed five hundred dollars ($500.00) or by imprisonment in the county jail for a term not exceeding sixty (60) days, or by both such fine and imprisonment. With respect to violations of this Code that are continuous with respect to time, each day the violation continues is a separate offense."

133.    The Property is zoned R-1A pursuant to the LDC.

134.    Many institutional, commercial, and other non-residential land uses are permitted in the R-1A zoning district either by right or with a special exception.

135.    In the R-1A zoning district, "Churches, mosques, synagogoues [sic], temples and other religious institutions with or without attendant schools, educational buildings and/or recreational facilities" are allowed with a "special exception."

136.    Other uses that are permitted by special exception in the R-1A zoning district, and which could be permitted on the Property with a special exception, include "Stadiums in conjunction with schools," "Indoor clubs, bowling clubs, private indoor clubs, bridge clubs, indoor recreational uses," "Golf driving ranges, Golf cart rentals, ski instruction, swimming pools, tennis courts, little league and softball fields, outdoor skating rinks, amusement rides, paintball operations, day camps, rodeos, and go-cart raceway," "Private kindergarten, elementary, junior high, middle and high schools, including those with dormitories or boarding facilities," "Schools (charter),"

and "Community centers."

137.   The properties within the Sand Lake Hills community, generally understood as from Palm Lake Circle and Palm Lake Drive south to Wallace Road between Dr. Phillips Boulevard and South Apopka Vineland Road, are mostly zoned R-1A or R-CE.

138.   Designating a "special exception" use within a zoning district means that the County has made a legislative determination that the use is permitted within a district and the applicant is entitled to the use unless the use would "adversely affect the public interest."

139.   Places of worship are permitted only by "special exception" in eight (8) of the County's nine (9) non-University residential zoning districts, including R-1A and R-CE.

140.   Two of these residential zoning districts—the NC and NAC zones—do not apply to any currently zoned areas within Orange County but instead apply to "future" land uses when existing neighborhoods are redeveloped.

141.   In August 2018, the County's Code Enforcement cited OTC for operating a religious institution in the R-1A zoning district without having obtained a special exception.

142.   On or about June 28, 2019, the County filed a lawsuit against OTC in the Circuit Court for Orange County, seeking a preliminary injunction to prevent OTC from operating on the Property.

143.   The Court denied the injunction, noting that the County "put on no

evidence to refute any of the testimony from [OTC's] neighbors to demonstrate that the public would be served by granting the injunction . . . [nor] to show that [OTC] and its congregation negatively impacted the neighborhood in any way."

### 1. OTC Obtains a Special Exception and Variance in 2020

144.   Following that lawsuit, in 2020, OTC obtained a special exception and variance to operate a religious institution and to allow grass parking, respectively (the "2020 Approval").

145.   As part of the application for the special exception and variance, OTC conducted a parking study which demonstrated that the parking spaces included within the plan exceeded the number required by the LDC.

146.   The parking spaces required in the 2020 special exception were calculated by examining the synagogue's "typical seating capacity" and applying the formula in the LDC of one (1) space for every three (3) seats plus a space for each employee.

147.   Only the BZA may grant a special exception.

148.   Pursuant to the LDC, in order to grant a "special exception", the BZA must find that an application meets <u>all</u> of the following criteria:

  a.   The use shall be consistent with the comprehensive plan.

  b.   The use shall be similar and compatible with the surrounding area and shall be consistent with the pattern of surrounding development.

  c.   The use shall not act as a detrimental intrusion into a surrounding area.

d.  The use shall meet the performance standards of the district in which the use is permitted.

e.  The use shall be similar in noise, vibration, dust, odor, glare, heat producing and other characteristics that are associated with the majority of uses currently permitted in the zoning district.

f.  Landscape buffer yards shall be in accordance with section 24-5 of the Orange County Code. Buffer yard types shall track the district in which the use is permitted.

149.   Thus, even though a place of worship is presumptively permitted on such property, development can be thwarted upon claims that the use does not meet the impossibly vague and subjective standard that it is not "similar and compatible with the surrounding area" or that it is "a detrimental intrusion into a surrounding area."

150.   The LDC provides no guidance as to what constitutes being "similar and compatible with the surrounding area."

151.   The LDC provides no guidance as to what constitutes "act[ing] as a detrimental intrusion into a surrounding area."

152.   The LDC does not define the term "compatible."

153.   The LDC does not define the term "similar."

154.   The LDC does not define the term "detrimental."

155.   The LDC does not define the term "intrusion."

156.   Such standardless discretion is especially problematic when directed at religious applicants, for the use of subjective criteria to evaluate particular religious

land uses—and their perceived impact on the surrounding areas—invites arbitrariness and opens the process to bias and covert discrimination.

157.    The Orange County standards for obtaining a special exception do not sufficiently confine the discretion of the BZA to prevent it from discriminating against an applicant solely on the basis of the religion of the applicant or the nature of the religious use of the property, rather than on the basis of the impact which granting the special application would have on the community.

158.    Pursuant to the LDC, in order to grant a "variance," the BZA must find that an application meets <u>all</u> of the following criteria:

    a.    A written application and site plan for a variance is submitted demonstrating that special conditions and circumstances exist which are peculiar to the land, structure or building involved and which are not applicable to other lands, structures or buildings in the same district.

    b.    Literal interpretation of the provisions of the resolutions would deprive the applicant of rights commonly enjoyed by other properties in the same district under the terms of the zoning ordinance.

    c.    The special conditions and circumstances do not result from the actions of the applicant.

    d.    Recommending granting the variance requested will not confer on the applicant any special privilege that it denied [sic] by the zoning

ordinance to other lands, structures or buildings in the same district. No nonconforming use of neighboring lands, structures, or buildings in the same district, and no permitted use of lands, structures or buildings in other districts shall be considered grounds for the issuance of a variance.

e.     Notice of public hearing shall be given as required by this act for hearing before the board of zoning adjustment.

f.     The public hearing shall be held. Any party may appear in person or by agent or by attorney.

g.     The Board of Zoning Adjustment shall make findings that the requirements of subsection (3) have been met by the applicant for a variance.

h.     The Board of Zoning Adjustment shall further make a finding that the reasons set forth in the application justify the granting of the variance, and that the variance is the minimum variance that will make possible the reasonable use of the land, building or structure.

i.     The Board of Zoning Adjustment shall further make a finding that the granting of the variance shall be in harmony with the general purpose and intent of the zoning ordinance, will not be injurious to the neighborhood, or otherwise detrimental to the public welfare.

159.   Pursuant to the LDC, the BCC must confirm all BZA decisions prior to

the final issuance or denial of any land use application seeking a permit.

160.    Pursuant to the LDC, any person may appeal the BZA's decision to the BCC within 15 days of the decision, and the BCC must conduct a *de novo* hearing on the application.

161.    BZA Staff typically prepares a report for the BZA prior to a hearing on an application, in which it offers the BZA a recommendation and may also include recommended conditions for the BZA to consider as a way to approve the application.

162.    The 2020 BZA Staff Report listed twelve (12) potential conditions for approval of OTC's application, including a limitation on the hours of operation as follows: "1) Mondays through Fridays: 6:00 a.m. to 8:00 a.m. and 15 minutes before sundown to one hour after sundown; 2) Saturdays: 8:00 a.m. to 1:00 p.m. and 90 minutes before sundown to one hour after sundown; and 3) Sundays: 8:00 a.m. to 10:00 a.m. and 15 minutes before sundown to one hour after sundown," which OTC originally proposed as part of the 2020 Application after consultation with the County.

163.    These times were selected in order to accommodate, albeit imperfectly, OTC's religious needs, which are tied to sundown and nightfall rather than specific times.

164.    The twelve conditions are as follows:

1.    Development shall be in accordance with the site plan dated May 13, 2020, subject to the conditions of approval, and all applicable laws, ordinances, and regulations. Any proposed non-substantial deviations, changes, or modifications will be subject to the Zoning Manager's review and approval. Any proposed substantial deviations, changes, or modifications will be subject to a public hearing before the Board of Zoning

Adjustment (BZA) where the BZA makes a recommendation to the Board of County Commissioners (BCC).

2. Pursuant to Section 125.022, Florida Statutes, issuance of this development permit by the County does not in any way create any rights on the part of the applicant to obtain a permit from a state or federal agency and does not create any liability on the part of the County for issuance of the permit if the applicant fails to obtain requisite approvals or fulfill the obligations imposed by a state or federal agency or undertakes actions that result in a violation of state or federal law. Pursuant to Section 125.022, the applicant shall obtain all other applicable state or federal permits before commencement of development.

3. Any deviation from a Code standard not specifically identified and reviewed/addressed by the Board of County Commissioners shall be resubmitted for the Board's review or the plans revised to comply with the standard.

4. The applicant shall submit construction plans through the commercial site plan review process within 180 days of final approval by Orange County, and complete the required improvements pursuant to the approved construction plans within one year after the Board of County Commissioners' approval of the special exception and variance, or else this approval shall become null and void, unless extended by the Board of County Commissioners for a limited duration for good cause shown.

5. Hours of operation shall be as follows: 1) Mondays through Fridays: 6:00 a.m. to 8:00 a.m. and 15 minutes before sundown to one hour after sundown; 2) Saturdays: 8:00 a.m. to 1:00 p.m. and 90 minutes before sundown to one hour after sundown; and 3) Sundays: 8:00 a.m. to 10:00 a.m. and 15 minutes before sundown to one hour after sundown.

6. No more than four (4) advertised outdoor special events open to the public per calendar year, and the hours of such events shall be limited from 9:00 a.m. to 9:00 p.m. The use of outdoor amplified sound and music is prohibited. All outdoor special events shall be reviewed and approved by the Orange County Fire Marshal's Office. The applicant shall submit

applications/plans to the Fire Marshal's Office a minimum of 30 days prior to the date of each event.

7. Noise shall be regulated by Chapter 15, Orange County Code, "Environmental Control," specifically, Article V, "Noise Pollution." No outdoor speakers or other audio amplification shall be permitted.

8. Signage shall be in accordance with 31.5-75, Orange County Code.

9. Development shall comply with Chapter 24 (Landscaping), Buffering and Open Space) and Chapter 15 Article VIII (Tree Protection and Removal). In the event there is a conflict between Chapter 24 or Chapter 15 and the site plan, the provisions of Chapter 24 and Chapter 15 shall prevail.

10. A six (6) foot high vinyl fence shall be maintained along the eastern and northern property lines. Should the County remove the six (6) foot high wall along the western property line, a six (6) foot high vinyl fence shall be installed and maintained by the property owner.

11. The grass parking spaces shall be fitted with wheel stops. The drive aisles and handicap parking spaces shall be improved with a durable all-weather surface and properly drained in accordance with Orange County Code.

12. There shall be no on-street parking. All parking shall be contained off-street on the subject property in the driveway or behind the gated driveway in the parking area.

165. The BZA approved the special exception. The approval included all twelve (12) conditions with alterations to proposed condition number 5 as follows:

5) Hours of operation shall be as follows:

1) Mondays through Fridays: 6:00 a.m. to 9:00 p.m.;

2) Saturdays: 8:00 a.m. to 1:00 p.m. and 90 minutes before sundown to one hour after sundown; and

3) Sundays: 8:00 a.m. to 10:00 a.m. and 15 minutes before sundown to one hour after sundown.

166.   Given OTC's religious needs, the BZA's altered condition number five (5), imposing a stopping time of 9:00 p.m. on Monday through Friday, regardless of the timing of sundown/nightfall and the religious obligations associated with when certain religious observances may be performed pursuant to Jewish law, and in light of other nightly religious practices such as nightly religious study, significantly burdens OTC's religious exercise.

167.   For example, the traditional observance of the Jewish holiday of Shavuot includes studying Jewish texts through the night, which OTC is currently prohibited from doing.

168.   The 9:00 p.m. limitation is further onerous because Jewish law specifies that many observances must begin after sunset, including, *inter alia*, the synagogue service welcoming the weekly Sabbath, the services that begin the holidays of Rosh Hashanah and Yom Kippur, the reading of particular prayers associated with the holiday of Simchat Torah, religious study, and the reading of the Megillah on the holiday of Purim.

169.   OTC is not able to control the time that the sun sets, and, therefore, cannot control whether its prayers can be concluded by 9:00 p.m.

170.   The performance of religious activities directly tied to sunset is required by Jewish law for each of the holidays listed above.

171.   Another onerous condition included in the 2020 Approval is a limitation

32

on the number of "public" outdoor events that OTC can hold each year, to only four (4) such events, whether or not these outdoor events are religiously significant.

172.    OTC seeks to freely celebrate its religious holiday of Sukkot (which lasts for eight (8) days) outside.

173.    Additionally, OTC must hold events in its current facility outside because it lacks alternative indoor space.

### 2. Houses of Worship are Required to Provide More Parking Than Similar Nonreligious Assembly and Institutional Uses

174.    The LDC treats houses of worship on less than equal terms as other nonreligious assembly and institutional land uses with regard to off-street parking requirements.

175.    The land use category "Amusement or assembly places without fixed seats (go-cart tracts, mini-golf courses, driving ranges and other similar outdoor uses)" has the following off-street parking requirement: "1 space per each 3 patrons, plus 1 space per each employee."

176.    The County has taken the position that OTC's proposed synagogue falls under the use described as "assembly places without fixed seats" in this section.

177.    Under the LDC, certain nonreligious assembly and institutional land uses do not use the "patron" designation to calculate off-street parking requirements.

178.    Other nonreligious assembly and institutional uses do not use the maximum occupancy of any one space in the building to calculate off-street parking requirements.

179.    Pursuant to the LDC, clubs, lodges, and fraternities must provide only one (1) off-street parking space for each five (5) members plus one space for each bedroom.

180.    Pursuant to the LDC, universities or colleges must provide only one (1) off-street parking space for each 200 square feet of classroom and office space.

181.    Pursuant to the LDC, schools must provide only one (1) off-street parking space for every four (4) seats in the assembly hall or four (4) spaces per each instructional room plus one (1) space for every three (3) high school students, whichever is greater.

182.    Pursuant to the LDC, hotels, motels and time share units must provide only one (1) off-street parking space for each 1.5 rooms, plus one (1) space for each 100 square feet of office, plus restaurant and retail sales criteria must be met when applicable.

183.    Pursuant to the LDC, hospitals, sanitariums, foster group homes and similar institutions must provide only two (2) off-street parking spaces for each bedroom, but otherwise fall under office building criteria, which requires one (1) space for each 200 square feet of floor area "used for office purposes."

184.    The County has no justification for treating religious institutions on less than equal terms as clubs, lodges and fraternities, universities, colleges, schools, hotels, motels, hospitals, sanitariums, foster group homes, and similar institutions for purposes of calculating off-street parking requirements.

*F.*   *OTC Submitted Its 2024 Application to Alleviate Severe Burdens on Its Religious Observances*

185.   As OTC's congregation grew and its religious worship suffered due to lack of space, OTC began drafting plans to enlarge its facilities.

186.   As OTC prepared to seek an expansion of its facility, it reached out to its County Commissioner, Nicole Wilson, and met with her in November 2023.

187.   Commissioner Wilson's office confirmed in November 2023 that there had not been any noise or parking complaints submitted to her office or the Orange County Zoning Department since OTC's special exception approval in 2020.

188.   During the meeting, OTC representatives showed Commissioner Wilson a smaller potential version of the new synagogue and discussed options for the facade.

189.   Commissioner Wilson encouraged OTC to present a larger, three-story facade. She told OTC, "I don't want you to come back in a couple of years."

190.   Commissioner Wilson's staff encouraged OTC to have a pre-application meeting with the Zoning Department to discuss their request, and asked OTC to bring forward all anticipated and foreseeable improvements to that meeting so that staff could provide feedback.

191.   Following the meeting with Commissioner Wilson, i.e., the County Commissioner for its District, OTC representatives reasonably believed that Commissioner Wilson would support the application.

192.   OTC filed an application with the BZA on or about May 20, 2024 (the "2024 Application") to enlarge its synagogue on the Property.

193.    Subsequently, County Zoning Department staff met with OTC and its attorney. At that meeting, OTC brought a larger, three-story application based on its earlier meeting with Commissioner Wilson.

194.    Following the meeting with the Orange County Zoning Department staff, OTC representatives reasonably believed that staff would recommend approval for its application.

195.    The 2024 Application sought (1) a Special Exception to locate a house of worship in the R-1A district, and (2) a Variance to reduce the number of parking spaces that the County stated would be required from 52 to 35. As discussed below, OTC disputed that the LDC required 52 parking spaces for its use.

196.    The 2024 Application sought a 9,376-square foot expansion to the existing building.

197.    Upon information and belief, the proposed new building will be similar to, and will contain less square footage than several of, the other religious institutions located on South Apopka Vineland Road.

198.    The proposed new building will add a second floor and partial third floor with outdoor balconies.

199.    The new layout of the building will also mean that worship services are not disturbed any time someone enters the building. This will be a major improvement over the current building, which lacks any kind of a vestibule and where the doorway opens directly into the worship space.

200.    The proposed new building will provide classroom space, office space,

storage space, a social hall, and study space, which will enable OTC to hold the education classes for children and adults, for adults to engage in the study of religious texts (which is a fundamental component of Jewish adulthood), for clergy to engage in pastoral care and counseling, and for the entire congregation to celebrate life cycle events and holidays indoors, where heat or inclement weather will not prevent or disturb celebrations.

201. The proposed new building meets all dimensional requirements for the R-1A zone, including height limitations and setback requirements, as set forth in the LDC.

202. OTC participated in community meetings regarding the 2024 Application held by the County on November 20, 2024, and December 10, 2024.

203. After hearing feedback from certain local residents at the February 7, 2025 BZA meeting regarding the design of the new synagogue, OTC presented a redesigned structure to make it even more compatible with the residential neighborhood, submitting new plans on March 28, 2025.

### 1. *The County Failed to Use the Least Restrictive Means of Advancing Any Interest in Road Safety*

204. The new synagogue would have no significant land use impacts, including with respect to traffic.

205. Nevertheless, as part of its plan and effort to reduce any traffic concerns within Sand Lake Hills, OTC sought a meeting with the County to obtain an access easement across the strip of County-owned property from the Property directly to

South Apopka Vineland Road.

206.    OTC was, and remains, willing to close off vehicular access from the Property to Banyan Boulevard if OTC can obtain access, instead, from South Apopka Vineland Road.

207.    The County originally denied the access easement without even meeting with OTC.

208.    After the BZA and County were informed of this, OTC met with the County to discuss the possibility of obtaining an easement across County property to access South Apopka Vineland Road directly.

209.    The County refused to permit such easement, stating that the County's Code of Ordinances *requires* that "[a]ll lots shall have access from an internal subdivision street."

210.    There are less restrictive means available to the County than denying this access, such as ceding OTC's lot from the subdivision or permitting access from both sides, with emergency access only from Banyan Boulevard.

211.    Another purported justification provided was that the County's property was obtained for stormwater management purposes.

212.    The County acquired that property in or around 1990.

213.    The County has not installed or developed that property with stormwater management infrastructure for the past 35 years.

214.    The County also claimed that such access would be "too close to the intersection" with Banyan Boulevard. However, Southwest Middle School similarly

38

has access from both Dr. Phillips Boulevard and Banyan Boulevard.

215.    Further, there is an intersection with another road (Tarawood Drive), a left turn lane, and a break in the median already located in this section of South Apopka Vineland Road.

216.    Neighbors opposed the 2024 Application on the basis that the access was from Banyan Boulevard and also opposed OTC obtaining access to the major roadway of South Apopka Vineland Road.

### 2. *The County Imposed Arbitrary and Unlawful Parking Requirements on OTC*

217.    County staff issued its Staff Booklet on the 2024 Application in advance of a hearing scheduled for February 7, 2025.

218.    Staff acknowledged that the proposed expansion complies with "all of the zoning district development standards" and only requires a special exception because it will be used as a religious institution.

219.    A residence of the same size as the proposed synagogue could be built on the Property.

220.    County staff determined that the proposed new building would require 52 parking spaces.

221.    Section 38-1476 of the LDC governs off-street parking spaces required for specific land uses.

222.    OTC's proposed synagogue falls under the use described as "assembly places" in this section.

223. The section provides that "Amusement or assembly places containing fixed seats" require "1 space for each 3 fixed seats provided for patron use, plus 1 space per employee."

224. It also provides that "Amusement or assembly places without fixed seats (go-cart tracts, mini-golf courses, driving ranges and other similar outdoor uses)" require "1 space per each 3 patrons, plus 1 space per each employee."

225. The term "patron" is undefined in the LDC.

226. The LDC provides that, for places of worship with fixed seating, such as pews, parking would be based on the number of fixed seats for congregants (or "patrons").

227. Instead of using the number of congregants that would attend services in the synagogue's sanctuary space, Orange County Staff calculated a "maximum occupancy" for the proposed "event space" in the proposed new building based on the Florida Building Code and determined the parking requirement based on that maximum occupancy.

228. It is only through this calculation that the 2024 Application purportedly required a parking variance.

229. Upon information and belief, the County has not applied this method of calculating off-street parking requirements to other places of worship.

230. This is a departure from the method used by the County in 2020, which, as the County later confirmed during hearings on the 2024 Application, was based on the "patrons" requirement stated in the LDC and utilized the worship space, rather

40

than total square footage of any one area within the building.

231.   The BZA staff's calculation, adopted by the BZA, discriminated against OTC because its prayer sanctuary does not have fixed seats, even though fixed seats are not conducive to OTC's mission, including but not limited to the Jewish studies that take place between study partners and groups at tables. As a result, OTC was subjected to a different and higher standard than if its seats were fixed.

232.   The BZA staff's calculation, adopted by the BZA, also discriminated against OTC by using maximum occupancy figures for OTC's social hall, not its sanctuary where it conducts prayer services.

233.   If the parking requirement was calculated using the "patrons" in the sanctuary, then no parking variance would be required.

234.   OTC submitted a Parking Review by Traffic & Mobility Consultants in support of the 2024 Application.

235.   The Parking Review included expert observations of the actual parking demand at OTC on holidays and weekdays.

236.   The Parking Review observations indicated that the parking included in the 2024 Application was sufficient for OTC's needs.

237.   Specifically, the Parking Review indicated that the maximum parking use at OTC was for twenty (20) vehicles, which was due to some families driving before sundown on Friday and leaving their vehicles at OTC until after sundown on Saturday, as Orthodox Jews do not drive during the Sabbath. The weekday maximum parking use was much lower.

41

238.   There was no other traffic study submitted to the BZA.

> 3.   *The County Arbitrarily Applied the LDC in a Standardless Manner to OTC's Application*

239.   As part of its assessment of the 2024 Application, BZA Staff applied the County's special exception criteria to the 2024 Application.

240.   BZA Staff found that the 2024 Application met the following three special exception criteria: 1) consistent with the comprehensive plan; 2) similar in noise, vibration, dust, odor, glare, heat producing to the surrounding area; and 3) landscape buffer yards shall be in accordance with Section 24-5 of the Orange County Code.

241.   Staff found that the 2024 Application did *not* meet the special exception criteria requiring that the use: 1) is similar and compatible with the surrounding area; 2) shall not act as a detrimental intrusion into a surrounding area; and 3) will meet the performance standards of the district.

242.   Staff's determination that the 2024 Application did not meet the three special exception criteria listed above was based entirely on the fact that the 2024 Application was for a religious institution and because staff was recommending denial of the parking Variance.

243.   Staff also stated that the 2024 Application did not meet any of the criteria for a parking variance.

244.   Staff proposed 14 possible conditions for approval:

> 1. Development shall be in accordance with the site plan and elevations date stamped March 19, 2025, subject to the conditions

of approval, and all applicable laws, ordinances, and regulations. Any proposed non-substantial deviations, changes, or modifications will be subject to the Zoning Manager's review and approval. Any proposed substantial deviations, changes, or modifications will be subject to a public hearing before the Board of Zoning Adjustment (BZA) where the BZA makes a recommendation to the Board of County Commissioners (BCC).

2. Pursuant to Section 125.022, Florida Statutes, issuance of this development permit by the County does not in any way create any rights on the part of the applicant to obtain a permit from a state or federal agency and does not create any liability on the part of the County for issuance of the permit if the applicant fails to obtain requisite approvals or fulfill the obligations imposed by a state or federal agency or undertakes actions that result in a violation of state or federal law. Pursuant to Section 125.022, the applicant shall obtain all other applicable state or federal permits before commencement of development.

3. Any deviation from a Code standard not specifically identified and reviewed/addressed by the Board of County Commissioners shall be resubmitted for the Board's review or the plans revised to comply with the standard.

4. The applicant shall submit a building permit for the proposed expansion within 2 years of final approval of the special exception and variance by Orange County, or else this approval shall become null and void, unless extended by the Zoning Manager for a limited duration for good cause shown.

5. Hours of operation shall be as follows: 1) Mondays through Fridays: 6:00 a.m. to 9:00 p.m.; 2) Saturdays: 8:00 a.m. to one hour after sundown; and 3) Sundays: 8:00 a.m. to one hour after sundown.

6. No more than four (4) advertised outdoor special events open to the public per calendar year, and the hours of such events shall be limited from 9:00 a.m. to 9:00 p.m. The use of outdoor amplified sound and music is prohibited. On-street parking associated with special events is prohibited. All outdoor special events shall be reviewed and approved by the Orange County Fire Marshal's Office. The applicant shall submit applications / plans to the Fire Marshal's Office a minimum of 30 days prior to the date of each event.

43

7. Noise shall be regulated by Chapter 15, Orange County Code "Environmental Control", specifically Article V "Noise Pollution Control". No outdoor speakers or other audio amplification shall be permitted.

8. Signage shall be in accordance with Sec. 31.5-75 of Orange County Code, as may be amended.

9. Development shall comply with Chapter 24 (Landscaping, Buffering and Open Space) and Chapter 15 Article VIII (Tree Protection and Removal). In the event there is a conflict between Chapter 24 or Chapter 15 and the site plan, the provisions of Chapter 24 and Chapter 15 shall prevail.

10. A six-foot high vinyl fence shall be maintained along the eastern and northern property lines. Should the County remove the six-foot wall along the western property line, a six-foot vinyl fence shall be installed and maintained by the property owner.

11. The grass parking spaces shall be fitted with wheel stops. The drive aisles and handicap parking spaces shall be improved with a durable all-weather surface and properly drained in accordance with Orange County Code.

12. There shall be no on-street parking, including for special events. All parking shall be contained off-street on the subject property in the driveway or behind the gated driveway in the parking area

13. The unpermitted shed shall be removed or permitted in a conforming location on the property prior to approval of the building permit for the expansion of the religious institution.

14. The renting of the facilities to the general public shall be prohibited.

245.    These recommended conditions maintained the 2020 Conditions of Approval while adding two (2) additional proposed conditions (Condition numbers 13 and 14).

246.    Staff is permitted to continue to recommend conditions and, pursuant to the LDC, there are no restrictions on the number or type of conditions that staff may

suggest or that the BZA (or BCC) may impose to mitigate harms that it perceives from approval; for example, changes to the proposed size of the building or additional landscaping.

### 4. *The BZA Hearing was Dominated by Antisemitic Comments and Tenor and Was Divorced of Land Use Criteria*

247.    The BZA heard the 2024 Application in a single meeting on May 1, 2025.

248.    During the May 1, 2025 hearing, the crowd had to be instructed to conduct itself civilly, without outbursts.

249.    During that hearing, OTC's attorney advised the BZA that OTC was "prepared to accept reasonable conditions . . . ."

250.    During the hearing, staff confirmed that the parking calculations had been based simply on the room with the highest occupancy.

251.    The public hearing before the BZA was riddled with comments that did not address the purported concerns of building size or traffic, but, rather, focused on Orthodox Jews in the neighborhood and the growth of that community, and strongly suggested antisemitic bias.

252.    For example, during the May 1, 2025 hearing, a lawyer representing the neighbor-objectors suggested that Orthodox Jews would not be able to move to a neighborhood without an existing synagogue for them to attend. Such a suggestion would effectively bar Orthodox Jews from moving to a community that lacked an existing synagogue.

253.    The attorney representing certain neighbor-objectors stated that, "in 2020

it was changed to allow basically a smaller scale to get basically their foot in the door."

254.   The attorney further described the 2024 Application as "a slippery slope because if this body says we're going to consider changes of circumstances and we're going to say we don't care about the interests of those that bought first, that relied upon what was there, and we're instead going to change what they bought, again I think that's a rather dangerous precedent."

255.   The crowd cheered at the attorney's statements.

256.   A neighbor-objector falsely told the BZA that "in 2022 Christ Community Church was for sale on Apopka-Vineland Road . . . . There was plenty of opportunity. They owned a white elephant, unfortunately, at 8613 Banyan. And when other properties came up for sale that would fulfill that walking requirement, they walked away from them."

257.   OTC had inquired about purchasing the Christ Community Church property but had been told that it was not for sale.

258.   Opponents of the 2024 Application have met at Christ Community Church to coordinate their opposition on multiple occasions. That church has knowingly made its space available for this purpose.

259.   One neighbor-objector, who lives a mile away from OTC and began his remarks by stating he attends a Pentecostal Church, spoke about his purported efforts to "build community and inclusion" but opined that OTC's application was "self-serving" because OTC would serve only Jews (which he estimated to comprise a third of the community).

260.    Another neighbor-objector spoke against the 2024 Application on the basis that it did not benefit "me and my non-OTC neighbors" and that Orthodox Jews were wrong to "ask those of us in this community" to permit the expansion "just because those of you who attend the Torah Center decided to move into our neighborhood" despite it not having an existing, sufficiently large synagogue.

261.    One neighbor-objector, who identified herself as a director of the East Bay Homeowners Association, which does not include the Property, said that she opposes OTC's current existence and alleged that "some Orlando Torah Center member homeowners" were unlawfully expanding their properties or turning their residences into large mikvehs. She noted that there was "another temple" elsewhere in Orlando.

262.    That neighbor-objector's other comments focused on issues outside of land use concerns, such as complaints about parents driving their children to and from the Florida State-provided bus that takes them to school or about the driving habits of an individual who was going to OTC.

263.    That neighbor-objector also stated that she believes new members "are being recruited to move to this neighborhood," referring to Orthodox Jews.

264.    Another neighbor objector spoke in opposition to the 2024 Application, without citing a single land use criterion, and stated that "a member of the Jewish community" purportedly asked to buy his home and that he felt as though the person would try to "buy it from under me" such that "what you're trying to do for your growth is, unfortunately, you're trying to kick people out of their houses, and that only

47

benefits you."

265.    One objector, who does not live in Sand Lake Hills, but in the Bay Hill subdivision to the west of South Apopka Vineland Road, speculated on the financing for the expansion. He opined that OTC would "source it from the Orthodox Jewish communities that visit Central Florida and vacation in Central Florida" and that, based on his opinion that the proposed structure was larger than what the resident Orthodox Jewish community needs, OTC would "market" its building as a tourist attraction to "all Orthodox Jewish families that vacation in Central Florida," which he opined would severely negatively affect Sand Lake Hills.

266.    Most of the issues mentioned with respect to the Property, including a storage shed that had to be removed, landscaping, flooding, and sound would be alleviated by the expanded facility.

267.    The County's transportation planner testified that although the parking Variance was required, County Staff was not particularly concerned with the parking space reduction.

268.    She testified that County Staff's concern was about traffic stacking and queuing when cars leave OTC.

269.    Staff had not noted such a concern in the Staff Report.

270.    Neither County Staff nor neighbor-objectors performed any traffic studies in conjunction with the 2024 Application.

271.    One BZA member asked OTC's counsel what the total capacity of the building would be "if all the spaces were utilized at the same time," despite statements

that the building was never intended to be used that way.

272.    Another BZA member noted that that was a bit of an arbitrary question but that 155 was probably the maximum capacity as noted by the fire department.

273.    During public deliberations, another BZA member noted that there were other religious institutions "up and down [South] Apopka-Vineland Road, and we know that there are many," but that "I know there's a subjective statement, but the rendering shows as very striking. It's -- it doesn't look like, you know, what -- what looks like a church."

274.    Having previously asked about the maximum capacity of the proposed building, this BZA member opined that, although the size of the building met the height and setback requirements, "there's homes in Orange County that are 12,000 square feet. They don't have 155 people living in it or staying in it, so there – that's a significant difference in traffic and people there."

275.    He further stated that his "biggest concern is one day, you know, resale . . . ." and that the property could be sold to a 7-Eleven.[5]

276.    He further repeated a neighbor-objector's baseless guess of the number of synagogue member-families and agreed that, "if that number is somewhat accurate, it seems to me that if you weren't attracting people from outside of the area, that a much smaller facility could be built, which would be a little bit more conducive to the

---

[5] This BZA member was seemingly quoting an objector who lives more than a mile away from OTC, who concluded his remarks by purporting to quote the New Testament book, First Corinthians, "[L]et no one seek his own good but the good of his neighbor."

community."

277.   Convenience stores are not a permitted use within the R1-A zone, and a special exception granted to a house of worship would not permit the operation of the same.

278.   Another BZA member compared the proposed structure unfavorably to a Catholic church located on South Apopka Vineland Road, noting: "I'm familiar with the Catholic church that's a couple doors up, and the Catholic church sits on a large piece of property. But it sits on property that's – that the church is on and a school and a chapel. There may be some residential houses behind it, but it doesn't sit in a residential neighborhood."

279.   There was no discussion of whether the Catholic Church, or any of the churches on South Apopka Vineland Road looked like the houses nearby, or if the lone synagogue in the area might reasonably have different architecture than a house or a church.

280.   This BZA member also discussed the expectation of individuals in the subdivision that their homes would be investments that "would generate wealth for themselves and for their heirs," and compared the building of the synagogue to a golf course closing, opining that property values would decrease if the synagogue were built, although there had not been any evidence presented to the BZA on this point.

281.   One neighbor-objector, who had previously signed a petition opposed to the 2024 Application stating, "This use is not compatible with the surrounding residential area," listed her house for sale following the BZA denial at a price of more

than $400,000 above what it sold for in 2008, advertising that, "The kitchen has been thoughtfully designed with Kosher living in mind, offering extensive storage with separate cabinetry for food separation if you wish" and boasting "4 Blocks from the synagogue."

282.    The BZA member then referenced the neighbor-objector's false statement that other properties were available to OTC.

283.    Another BZA member inaccurately opined that, because the inadequate Property is available to OTC and despite the statement from OTC's Rabbi that OTC is required to modify its religious behavior as a result of the inadequate facility, there could purportedly not be a violation of RLUIPA.

284.    The BZA unanimously voted to deny the 2024 Application on May 1, 2025.

### G.    *OTC's Appeal to the Board of County Commissioners Suffered the Same Antisemitic Tenor and was Similarly, Divorced of Land Use Criteria*

285.    In accordance with the LDC, OTC appealed the denial of its application to the BCC on or about May 9, 2025.

286.    Following the BZA denial of the 2024 Application, County representatives reached out to OTC regarding a meeting to discuss an access easement from the Property directly to South Apopka Vineland Road.

287.    The Board of County Commissioners held a hearing on the 2024 Application on July 1, 2025.

288.    County staff presented the OTC's 2024 Application and recommended

possible conditions for approval.

289.   OTC's land use attorney confirmed that OTC was willing to agree to reasonable restrictions on the use.

290.   During the hearing, the large crowd had to be warned to maintain decorum.

291.   Once again, the founder of Residents United for Dr. Phillips, who lives nearly <u>five miles</u> from the Property, spoke in opposition to OTC's application. He introduced himself as an engineer and appeared to offer unqualified traffic engineering testimony when he clarified that his group was also opposed to OTC having access on South Apopka Vineland Road.

292.   The same neighbor-objector who spoke at the BZA hearing without mentioning a single land-use criterion, again told the story of his wife's passing and that he was "approached" by a Jewish person to purchase his home, which he imputed to OTC, guessing that "they spoke amongst themselves," in order to offer to buy his home, which he then opined, "that's the kind of level they're going to for this expansion . . . ." He again did not mention any legitimate land use criteria.

293.   One objector, who lives 2.5 miles from the Property across a divided roadway featuring commercial structures, and more than a mile outside of Sand Lake Hills, opined that OTC had "consistently [been] a burden on the neighborhood" and that the County should "shut down this site."

294.   An email from this objector includes a statement to "Please stop everything at 9 am each morning for one minute to remember those who have died as

a result of the Israel [sic] ethnic cleansing of Gaza."

295.    One neighbor-objector stated: "they were told . . . when you get big, you gotta go someplace else," before postulating about other properties, such as a public school, where OTC should locate.

296.    Another neighbor-objector stated that, if the OTC application were approved, "if my neighbor next door decides he or she want to build a 12,000 square foot facility because he wants to accommodate their family coming in from New York and they can't – that's the only place they can be together, so what's to stop that . . . ."

297.    Several objectors referenced alleged code violations by OTC that, upon information and belief, were part of a deliberate targeting strategy by hostile neighbors against Orthodox Jewish residents of Sand Lake Hills in conjunction with the hearings on OTC's application and appeal.

298.    Once the County Commissioners moved to deliberations, one County Commissioner began her remarks by defending the individual members of the BZA and instructing OTC members that their statements had been too harsh. She emphasized that she understood that OTC was severely limited by its space. The denial, she explained, was because OTC did not meet "one or more" of the special exception criteria. She then voted against the appeal based on the application not being compatible with the surroundings and not meeting the comprehensive plan.

299.    One County Commissioner asked a County Planner if a house that was the same size as the proposed OTC building would require any variances. The Planner did not answer the question but instead stated that the parking Variance and traffic

was different than a single family home, bypassing the question of the size of the building, which had dominated much of the public comment.

300.    During further discussion, the Board's Planner stated that only the County's commercial and industrial districts, and possibly the professional office district, permitted houses of worship by right.

301.    During the hearing, Commissioner Wilson mentioned "so many" walkable uses just outside of the Sand Lake Hills subdivision, such as the public library and the YMCA, before asking OTC's attorney if alternative locations had been considered, such as empty big box stores, "several office, industrial-type complexes – lots of other zoning districts that wouldn't even require this type of hearing in walking distance."

302.    During her remarks, Commissioner Wilson also opined that South Apopka Vineland Road was not pedestrian friendly and was not designed to be crossed by pedestrians.

303.    When OTC's attorney replied that OTC had investigated other options but found that these were not pedestrian friendly, Commissioner Wilson then interrupted him, claiming again that it was "very walkable," citing her own experience as a jogger.

304.    The YMCA that Commissioner Wilson cited is actually within the same R-1A zoning district that the Property is located, and the other office uses are "restricted C-O" zones that appear to have been carved out of residential zones.

305.    The "big box" stores are a mile from the closest point within Sand Lake

Hills and more than 1.5 miles from the center of Banyan Boulevard between South Apopka Vineland Road and Dr. Phillips Boulevard.

306.    Prior to these statements, Commissioner Wilson had left the room during much of the OTC's rabbi's statement during the public comment period, not listening to his comments.

307.    The Board then unanimously voted to deny OTC's appeal.

**H.    *OTC Faces Unfair Community Hostility and Targeting Due to its Religious Exercise***

308.    OTC faced significant community opposition during its 2024 Application.

309.    The Staff Report on the 2024 Application notes that, for the two community meetings in which OTC participated, "the overall tone of the meeting was negative."

310.    During the pendency of the 2024 Application, individuals in and around Sand Lake Hills voiced opposition that is outside the land use criteria for considering the 2024 Application.

311.    One individual, whose property borders OTC's, was observed standing on his roof seemingly taking photographs of the Property, including of children on the Property.

312.    During and/or after the pendency of the 2024 Application, several neighbor objectors entered onto the Property without consent and undertook unauthorized inspections, amounting to trespass. Some of these individuals have

engaged in such conduct on multiple occasions.

313.    Another individual, at a hearing on the 2024 Application, represented a nearby homeowners' association that does not include the Property.

314.    She showed photographs of what she called the congestion and traffic created by OTC, but the only vehicle that she showed in any of the photographs was a bus paid for by the State of Florida for use as a school bus.

315.    Instead, the offending "traffic" in the photographs was entirely Jewish children meeting their parents on the sidewalks and in the driveway by OTC.

316.    Neighbors in opposition to the 2024 Application wrongfully characterized it as an "office tower."

317.    Yard signs placed by neighbor-objectors stated: "Stop the Skyscraper."

318.    Additional yard signs featured illustrations of four buildings of more than a dozen stories each with the writing, "Single Family Homes – Yes! Commercial Bldgs –No!"

319.    A sign placed at the entrance to the Sand Lake Hills development and at the entrance to the East Bay development included the side view of OTC's architectural plans with a crossed-out circle over it and the wording, "No Commercial Bldgs in SandLake Hills."

320.    Prior to the three-story building being described as a "skyscraper" on social media, it had been dubbed by local residents as the "Torah Tower."

321.    Upon information and belief, many of those in opposition, including speakers at the BZA hearings on the 2024 Application, do not live in Sand Lake Hills.

322.    On at least one occasion, those in opposition had been collecting signatures in opposition to the application outside of the synagogue, during services.

323.    One local resident urged others online to fill out forms in opposition to the 2024 Application, stating, "The neighborhood is going down the drain[.]"

324.    Another stated, "These people are like rabid dogs and aren't letting up. Ugh!"

325.    Another warned that Jews should be kept out of the neighborhood because they might bring antisemitic violence with them: "With all the hate going on around the world no one's worried about how that can affect all of us. People who hate others do not care if those they are not targeting get caught in the crossfire. I don't want my neighborhood to become a war zone."

326.    One neighbor-objector wrote from her email address as the "Corporate Partnerships Manager & Development Officer" for a major local hospital to Commissioner Wilson following the community meetings: "I've tried to welcome new Jewish neighbors and they won't speak to me, they have no respect for the houses they rent, trash cans could stay out for a week, lawns only get mowed if I call the landlord . . . . Work for those of us who have made this community our home for decades instead of focusing on a building that should not even be in a residential community."

327.    Another neighbor-objector wrote to the County Planner, who testified at the BCC hearing, that: "My personal feeling is that Orthodox religion (be it Christian, Jewish, Muslim, etc.) oppresses women, girls and the LGBTQ community while unnaturally elevating the status of heterosexual men and boys. While I respect that my

neighbors do not all share my views, I oppose actions such as the expansion of this site into a property that dominates this residential neighborhood because I feel it will diminish diversity and equality as well as detract from the residential nature of this subdivision."

328.    One neighbor-objector to the Property told an OTC member that, "I don't want this to become an enclave like Manhattan."

329.    One neighbor in opposition at a BZA hearing reported that "[a]n affiliate of OTC is building a house."

330.    One neighbor-objector, who lives nearly a mile away from the Property, wrote on a BZA Feedback Form: "They do this in other cities dont [sic] let them destroy our beautiful areas wait first the building then the buses and traffic and horrible drivers then another building and so on this type of organization moves in slowly then the area is gone .i [sic] have a family on my block that when they have get togethers more than 10 cars show up and block drive ways and they are not nice people they get upset if you say anything about the way they park they have done this all over in many cities. Before you say iam [sic] anti Semitic [sic] my grandma was Russian Jewish. The Jewish community has strong political power they [sic] get what they want hopefully they will not build in side [sic] our beautiful area .plenty [sic] of room on sandlake or turkey lake commercial area they are trying to build cheap .commercial [sic] more expensive than residential in rent tax and insurance or even building. Than a small side street. [sic] Watch soon big buses blocking our small streets plus the parents all in minivans making traffic worse.please don't allow this."

331.   Another neighbor-objector, who runs a commercial business out of their home, wrote on a BZA Feedback Form that, "This project will be extremely detrimental for our community besides ILLEGAL. In the last year living here has already become more dangerous due to all the Jewish dangerous drivers. I was nearly killed twice by two different drivers that I know are connected to this group. They have been obnoxious as well which I never experienced during the 34 years here. I have Jewish friends & family who were shocked to hear that they are trying to drive us out of our homes. I was nearly hit as well by their 'tour buses' that have created daily dangerous encounters."

332.   Once again, the "tour buses" referenced by the neighbor are provided by the State of Florida and not by OTC. While they may be utilized by Jewish children, they are attending the unaffiliated Orlando Torah Academy.

333.   Once the community hostility to the 2024 Application was presented, OTC sought another meeting with its County Commissioner, but she declined.

334.   Following the BZA's denial of the 2024 Application, a member of the Residents United for Dr. Phillips group opined, "I am so happy for sand lake hills [sic]. But just remember it could have been any of our neighborhoods that was under siege [sic]."

335.   Upon information and belief, the terms used by hostile local residents such as "under siege," "enclave like Manhattan," and "rabid dogs" are code words for Orthodox Jews.

336.   Neighbor complaints to the County about Orthodox Jewish residents

within Sand Lake Hills and about OTC increased dramatically after OTC submitted the 2024 Application.

337.    These complaints were often encouraged or accepted wholesale by County staff.

338.    Neighbor complaints repeatedly conflated OTC with any action by any Orthodox Jewish person or resorted to antisemitic "dog whistles."

339.    On or about October 25, 2024, a neighbor-objector sent each of the County Commissioners an email in opposition to OTC's application in which he alleged, *inter alia*, that cars were parking in front of OTC in violation of the special exception. Commissioner Wilson's Administrative Aide wrote back, "good work. This truly helps in sharing your voice," whereupon the neighbor-objector sent photos of the parked cars to the Administrative Aide.

340.    The County's Chief Inspector quickly identified that the cars were not in fact parked in front of OTC, but the next block over and that it was not clear that they were connected to OTC.

341.    On or about May 24, 2025, a neighbor sent photos to the Chief Inspector purporting to show the number of cars in OTC's parking lot and cars parked on the street at an intersection near OTC.

342.    The cars parked on the street were not connected to OTC.

343.    The County Inspector worked with a hostile neighbor regarding purported Code violations at OTC and the property next door.

344.    On one occasion, the hostile neighbor sought a search warrant for 8607

Banyan and the Chief Inspector wrote that she would consult with the County Attorney and get back to him on the requirements. She then gave him advice about the documentation requirements to obtain a search warrant.

345.    The hostile neighbor continued to work with the Chief Inspector to schedule County observations and inspections of OTC's property, the property next door, and even OTC's rabbi's nearby home.

346.    On or about June 11, 2025, the same hostile neighbor sent pictures of OTC's recycling cans to the County Commissioners, complaining that he was "a victim of OTC's constant and numerous violations," including three instances in which the trash cans of OTC and the next-door property were put out together. He noted that, on each occasion, "numerous [Sand Lake Hills] residents contacted the trash company, and they opened an investigation," which led to two of the trash cans being "repossessed." He urged denial of OTC's appeal on this basis.

### I.    OTC Continues to Face Unwarranted Harassment and Intimidation Through Code Enforcement Actions

347.    During the pendency of the 2024 Application, the County began citing OTC for violating the 9:00 p.m. time limitation condition on the Property.

348.    Prior to the hostile opposition to the 2024 Application, the County had never before enforced these provisions imposed upon OTC.

349.    On January 21, 2025, the County issued OTC a letter citing a number of purportedly violated conditions of approval, including the 9:00 p.m. time limitation.

350.    In the course of following up with the County, County staff informed

OTC's representatives that more complaints were being called in about OTC and its individual members than anyone else in the community.

351.    Enforcement of the 9:00 p.m. time limitation has forced OTC to choose between incurring additional governmental violations or violating the tenets of their faith.

352.    On Shavuot (a Jewish holiday), when some Jewish members of the community were walking to a house next door to the synagogue in the evening, there was a code enforcement officer waiting outside late on a Sunday night to monitor if anyone was using the synagogue on the religious holiday close to midnight on a Sunday night.

353.    In November 2024, the BCC considered a moratorium on all church-related permits in rural areas but relented after receiving pushback from religious rights groups.

354.    On July 2, 2025, the day following the BCC denial of OTC's appeal and the day on which trash is typically collected, representatives stopped at OTC to tell them that their trash and recycling would not be collected and that they needed to obtain a commercial dumpster.

355.    In the five (5) years since OTC's special exception was originally approved, the County had never notified OTC that it would not service the property.

### J. The County Has Treated Other Religious and Nonreligious Assembly and Institutional Land Uses More Favorably Than OTC

356.    The County has treated other religious institutions more favorably than

OTC with respect to the implementation of its land use regulations, including with respect to granting special exceptions and variances.

357.    The County has granted special exceptions to religious institutions for places of worship that would not be similar to and compatible with the surrounding area.

358.    The County has granted special exceptions to religious institutions for places of worship that would act as a detrimental intrusion into a surrounding area.

359.    The County treated OTC's application to expand its synagogue differently and worse than the applications of other similarly situated religious applicants.

360.    The standard relied upon by the County to deny the 2024 Application was not applied to other religious applicants.

361.    Prior to OTC's 2020 Application, the BZA had not questioned whether religious land uses can "handle the growth that may occur during the life cycle in that location" when issuing determinations on special exception applications.

362.    In recent years, several non-Jewish religious institutions received substantial zoning variances with a lack of scrutiny of claims to hardship or concern about parking reductions.

363.    The following religious institutions were similarly situated to OTC with respect to their compatibility with and intrusion into the surrounding area but were nonetheless granted special exceptions by the County: Church of Jesus Christ of Latter-Day Saints; House of Prayer Church of the Living God; and Our Lady of

Fatima Catholic Church.

364.    The County has granted special exceptions to religious institutions for places of worship that did not meet the performance standards of the district.

365.    The following religious institutions were similarly situated to OTC with respect to their compliance with the performance standards of the district but were nonetheless granted special exceptions by the County: Church of Jesus Christ of Latter-Day Saints; House of Grace Church & Ministries; Trinity Preparatory School of Florida, Inc.; House of Prayer Church of the Living God; Iglesia de Dios Pentecostal Church; Iglesia El Shaddai Church; and Eastland Baptist Church.

366.    The following religious institutions were similarly situated to OTC with respect to the criteria for a variance from parking requirements, but were nonetheless granted variances by the County: House of Grace Church & Ministries; Trinity Preparatory School of Florida, Inc.; and House of Prayer Church of the Living God.

367.    With regard to the House of Prayer Church of the Living God, which proposed only 13 of 33 required spaces to be located on site, staff wrote, "Allowing the parking variances will not confer any special privilege to this applicant as religious uses are typically allowed to have less parking as they are not full time uses." (Emphasis added.)

368.    The County has also treated nonreligious institutional worship more favorably than OTC.

369.    On or about March 7, 2023, the BCC granted a special exception and variance to McGregor Love for Growing Minds School despite it being similarly

situated to OTC with respect to all relevant land use criteria.

370.    OTC does not have any readily available alternatives to its use of the Property.

371.    Based on their sincerely held religious beliefs, OTC's congregants do not drive on the weekly Sabbath or on a number of Jewish holidays, thereby creating a requirement that the synagogue be within walking distance of congregants' homes. The reasonable walking distance is limited by, among other things, the physical limitations of congregants, including the elderly, disabled, parents, and young children.

372.    OTC's congregants, who have a religious obligation to attend synagogue and other religious events, include the elderly, the disabled, pregnant women, and children.

373.    There is no shade for pedestrians on South Apopka Vineland Road.

374.    During the BCC hearings on OTC's appeal, the County Commissioner for the area agreed that the area was not pedestrian-friendly.

375.    Children are able to walk themselves from their homes within Sand Lake Hills to the Property, but they would not be able to do so if they were to walk on or across South Apopka Vineland Road.

376.    There are no districts where a synagogue is permitted by right within a couple of miles of Sand Lake Hills.

377.    Upon information and belief, the BZA has granted zoning relief to other commercial and institutional uses that do not have ingress and egress on a major

roadway.

378.    OTC seeks to engage in the expressive conduct of worship, but it is inhibited due to Defendants' actions.

379.    The County's ordinances restrict not only OTC's expressive conduct of worship, but also OTC's expressive conduct of constructing a synagogue.

380.    The LDC provides County officials unbridled discretion in granting or denying the right to build a place of worship in the zone where the property is located.

381.    These factors grant the BZA unbridled discretion in granting a special exception and, thus, in choosing who is allowed to express their beliefs through worship in the County.

382.    The terms "similar," "compatible," "consistent," and "detrimental intrusion" are not defined and are not narrow, objective, or definite standards.

383.    Instead, they are vague terms that allow the BZA complete and arbitrary discretion to determine if a place of worship should be allowed.

384.    Any application could be denied as a "detrimental intrusion" or as not "similar and compatible" with surrounding residential uses.

385.    There is no compelling or legitimate governmental interest that requires the denial of the 2024 Application.

386.    Denying the 2024 Application is not the least restrictive means of achieving any governmental interest.

387.    The BZA was informed about the applicability of RLUIPA to its actions.

388.    Upon information and belief, other variance applications have been

granted without all the criteria being met.

389.   The BCC's decision was a final decision and was not reviewable by any other administrative body.

390.   OTC had a reasonable expectation that its use would be permitted on the Property.

391.   OTC informed the BZA that it was willing to agree to reasonable conditions to mitigate possible harms on the Property.

392.   The BCC's denial of OTC's 2024 Application severely impedes and prevents OTC's religious exercise.

393.   The construction activity related to OTC's synagogue, which would remove the substantial burden on OTC's religious exercise, would affect interstate commerce. The construction's effect on interstate commerce would result from, among other things: OTC's fundraising activities related to the construction; the transfer of funds to those it engages to assist with construction; the engagement of construction companies; the employment of and payments to construction workers either by OTC or by companies engaged by it; the purchase of necessary materials for the construction; the use of interstate highways for the transportation of persons and materials used for the construction; the use of interstate communication related to the construction; and other activities related to the construction.

394.   OTC's operation affects interstate commerce by or through, among other things, serving as a site for individuals traveling from outside of the State of Florida; the use of means of interstate communication to facilitate OTC's ongoing operations;

the use of interstate travel related to OTC's ongoing operations; and the purchase of goods and services related to OTC's ongoing operations and maintenance.

395. Defendants' actions described above all took place under color of state law.

396. The harm to OTC caused by Defendants' laws and actions, which prevent them from expanding the Property to accommodate its religious needs, is immediate and severe.

397. Application of the LDC to OTC's proposed religious land use creates extreme expense, delay, and uncertainty for OTC.

398. OTC has also suffered significant financial damages as a result of Defendants' laws and their application to OTC.

399. There are no quick, reliable, and viable alternative options for OTC's operations.

400. OTC has already expended significant funds to convert the existing structure on the Property and forcing it to relocate would create significant delay and uncertainty.

401. Moreover, if OTC were to relocate to a location that is not within reasonable walking distance of its congregants' homes, such relocation would not address those congregants' right to practice their faith, as they would not be capable of attending services at such a new location.

402. The uncertainty that OTC would be forced to endure is compounded by the special exception requirements in eight (8) out of nine (9) of the non-University

residential zoning districts within the County as well as the lack of narrowly defined standards for obtaining a special exception.

403.    OTC has no adequate remedy at law for the harm and damage caused by Defendants' wrongful laws and actions.

## CLAIMS

## COUNT I

**Religious Land Use and Institutionalized Persons Act of 2000**
**"Substantial Burdens"**
**42 U.S.C. § 2000cc(a)**
*(against the County and the BCC)*

404.    Paragraphs 1 through 403 are incorporated by reference as if set forth fully herein.

405.    By denying the 2024 Application, Defendants have deprived and continue to deprive OTC of its right to the free exercise of religion, as secured by RLUIPA.

406.    Each Defendant is a "government" within the meaning of RLUIPA.

407.    OTC's religious needs are "religious exercise" within the meaning of RLUIPA.

408.    The LDC and Defendants' implementation of it are land use regulations within the meaning of RLUIPA.

409.    Defendants have implemented a land use regulation in a manner that substantially burdens OTC's religious exercise.

410.    The substantial burden on OTC's religious exercise was not implemented

in furtherance of a compelling governmental interest.

411.   Even assuming that Defendants had burdened OTC's religious exercise in furtherance of a compelling governmental interest, such burden was not the least restrictive means of achieving a compelling governmental interest.

412.   OTC has been damaged as a result of Defendants' actions, including the ongoing burden on its religious exercise, as secured by RLUIPA, and monetary damages.

**COUNT II**

**Religious Land Use and Institutionalized Persons Act of 2000**
**"Nondiscrimination"**
**42 U.S.C. § 2000cc(b)(2)**
*(against the County and the BCC)*

413.   Paragraphs 1 through 403 are incorporated by reference as if set forth fully herein.

414.   By denying the 2024 Application, Defendants have deprived and continue to deprive OTC of its right to the free exercise of religion, as secured by RLUIPA.

415.   Each Defendant is a "government" within the meaning of RLUIPA.

416.   OTC is a religious assembly and institution.

417.   The LDC and Defendants' implementation of the same are land use regulations within the meaning of RLUIPA.

418.   Defendants have implemented a land use regulation in a manner that discriminates against OTC on the basis of its Orthodox Jewish religious denomination.

419.    The BCC acted with discriminatory intent against OTC's land use application.

420.    County officials also acted with discriminatory intent against OTC's land use application, including procedural and substantive deviations from the normal procedure during the processing of that application.

421.    Defendants were knowingly responsive to hostile and antisemitic statements from the public.

422.    OTC has been damaged as a result of Defendants' actions, including the ongoing burden on its religious exercise, as secured by RLUIPA, and monetary damages.

## COUNT III

**Religious Land Use and Institutionalized Persons Act of 2000**
**"Equal Terms"**
**42 U.S.C. § 2000cc(b)(1)**
*(against the County and the BCC)*

423.    Paragraphs 1 through 403 are incorporated by reference as if set forth fully herein.

424.    By denying the 2024 Application, Defendants have deprived and continue to deprive OTC of its right to the free exercise of religion, as secured by RLUIPA.

425.    Defendants have implemented a land use regulation that, on its face, treats religious uses on less than equal terms with nonreligious uses.

426.    Defendants have implemented a land use regulation in a manner that

treats OTC on less than equal terms with nonreligious uses.

427.    Defendants have enforced their land use regulation in a manner that treats OTC on less than equal terms with nonreligious uses.

428.    These nonreligious uses were similarly situated with respect to all relevant land use criteria.

429.    OTC has been damaged as a result of Defendants' actions, including the ongoing burden on its religious exercise, as secured by RLUIPA, and monetary damages.

## COUNT IV

### United States Constitution, First Amendment
### 42 U.S.C. § 1983
### Prior Restraint
### *(against the County and the BCC)*

430.    Paragraphs 1 through 403 are incorporated by reference as if set forth fully herein.

431.    Defendant Orange County, Florida regulates expressive conduct through the LDC.

432.    The LDC does not contain precise and objective criteria for decisionmakers to rely upon in rendering a decision on applications for special exception.

433.    The special exception criteria listed in the LDC delegates overly broad discretion to decisionmakers on the BZA and the BCC.

434.    Every application of the special exception criteria to a house of worship

creates a risk of suppressing ideas.

435.    The LDC does not contain precise and objective criteria for decisionmakers to rely upon in rendering a decision on applications for variances.

436.    The variance criteria listed in the LDC delegates overly broad discretion to decisionmakers on the BZA and BCC.

437.    Every application of the variance criteria to a house of worship creates a risk of suppressing ideas.

438.    As such, the LDC criteria for special exceptions and variances constitutes an unconstitutional prior restraint on OTC's protected religious expression and religious exercise under the First Amendment to the United States Constitution.

439.    Further, any such denial of OTC's application was not the least restrictive means of advancing a compelling governmental interest.

440.    OTC has been damaged as a result of Defendants' actions, including the ongoing burden to its constitutional rights, and monetary damages.

## COUNT V

**United States Constitution, First Amendment**
**42 U.S.C. § 1983**
**Free Exercise of Religion**
*(against the County and the BCC)*

441.    Paragraphs 1 through 403 are incorporated by reference as if set forth fully herein.

442.    The County's individualized denial of the 2024 Application was not the application of a neutral law of general applicability.

443.    The BCC's denial of the 2024 Application burdens OTC's religious exercise.

444.    Defendants have placed significant pressure on OTC to conform its behavior, including modifying or foregoing its religious precepts, which significantly hampers OTC's religious practice.

445.    Defendants were, at all times, acting under color of state law.

446.    The BCC's denial of the 2024 Application was made pursuant to a system of individualized assessments.

447.    The BCC's denial of the 2024 Application was not the least restrictive means of advancing a compelling governmental interest.

448.    OTC has been damaged as a result of Defendants' actions, including the ongoing burden to its constitutional rights, and monetary damages.

## COUNT VI

**United States Constitution, Fourteenth Amendment**
**42 U.S.C. § 1983**
**Equal Protection of the Laws**
**Religious Discrimination**
*(against the County and the BCC)*

449.    Paragraphs 1 through 403 are incorporated by reference as if set forth fully herein.

450.    By denying the 2024 Application, Defendants have deprived and continue to deprive OTC of its right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against

OTC on the basis of religion in the implementation of Defendants' land use regulations.

451.    Defendants have discriminated against OTC on the basis of its Orthodox Jewish religious denomination.

452.    The BCC acted with discriminatory intent against OTC's land use application.

453.    County officials also acted with discriminatory intent against OTC's land use application, including procedural and substantive deviations from the normal procedure during the processing of the 2024 Application.

454.    Defendants were knowingly responsive to hostile and antisemitic statements from the public.

455.    Defendants have treated other non-Orthodox Jewish houses of worship better than they have treated OTC.

456.    The non-Orthodox Jewish houses of worship that have received better treatment were similarly situated to OTC with respect to all relevant land use criteria.

457.    OTC has been damaged as a result of Defendants' actions, including the ongoing burden to its constitutional rights, and monetary damages.

<u>**COUNT VII**</u>

**United States Constitution, Fourteenth Amendment**
**42 U.S.C. § 1983**
**Equal Protection of the Laws**
**Racial Discrimination**
*(against the County and the BCC)*

458.    Paragraphs 1 through 403 are incorporated by reference as if set forth fully herein.

459.    By denying the 2024 Application, Defendants have deprived and continue to deprive OTC of its right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against OTC on the basis of race in the implementation of Defendants' land use regulations.

460.    Defendants have discriminated against OTC on the basis of the Jewish race of its members.

461.    The BCC acted with discriminatory intent against OTC's land use application.

462.    County officials also acted with discriminatory intent against OTC's land use application, including procedural and substantive deviations from the normal procedure during the processing of that application.

463.    Defendants were knowingly responsive to hostile and antisemitic statements from the public.

464.    Defendants have treated other applicants whose members were not Jewish better than they have treated OTC.

465.    The applicants whose members were not of the Jewish race and who have received better treatment then OTC were similarly situated to OTC with respect to all relevant land use criteria.

466.    OTC has been damaged as a result of Defendants' actions, including the ongoing burden to its constitutional rights, and monetary damages.

## COUNT VIII

### 42 U.S.C. § 1982
*(against the County and the BCC)*

467.    Paragraphs 1 through 403 are incorporated by reference as if set forth fully herein.

468.    Members of OTC are members of the Jewish race and OTC is identifiable with the Jewish race.

469.    The actions by Defendants are violations of OTC's right to own real property, as is enjoyed by white citizens, in violation of 42 U.S.C. § 1982.

470.    OTC has been damaged as a result of Defendants' actions, including the ongoing burden to its civil rights, as secured by 42 U.S.C. § 1982, and monetary damages.

## COUNT IX

### Florida Religious Freedom Restoration Act (FRFRA)
### Florida Statutes Annotated §§ 761, *et seq.*
*(against the County and the BCC)*

471.    Paragraphs 1 through 403 are incorporated by reference as if set forth fully herein.

472.    OTC is entitled to full review of Defendants' administrative action as a matter of right.

473.    Each Defendant is a "government" within the meaning of the FRFRA.

474.    OTC's religious needs are "religious exercise" within the meaning of the FRFRA.

475.    By denying the 2024 Application, Defendants have substantially burdened OTC's freedom of religion without using the least restrictive means of achieving a compelling governmental interest.

476.    OTC's Orthodox Jewish religious needs and practices described herein are required by Jewish law due to either Jewish law itself or the force of text or custom which gains the force of law over time ("*minhag*"), and these needs are clearly and consistently affirmed in classic formulations of doctrine and practice, have been observed continuously throughout Jewish history, and are consistently observed in recent times.

477.    By denying the 2024 Application, Defendants departed from the essential requirements of law.

478.    OTC has been damaged as a result of Defendants' actions, including the ongoing burden to its civil rights, as secured by the FRFRA, and monetary damages.

## COUNT X

**Article I, Section 3, Florida Constitution**
**Religious Freedom**
*(against the County and the BCC)*

479.    Paragraphs 1 through 403 are incorporated by reference as if set forth fully herein.

480.    OTC is entitled to full review of Defendants' administrative action as a matter of right.

481.    Article I, Section 3, of the Florida Constitution provides:

Religious freedom.—There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety.

482.    By denying the 2024 Application, Defendants have deprived and continue to deprive OTC of its right to freedom of religion, as secured by the Article I, Section 3 of the Florida Constitution, by imposing and implementing land use regulations both on their face and as applied in a manner that places a burden on OTC's freedom of religion without using the least restrictive means of achieving a compelling governmental interest.

483.    By denying the 2024 Application in violation of Article I, Section 3 of the Florida Constitution, Defendants departed from the essential requirements of law.

484.    OTC has been damaged as a result of Defendants' actions, including the ongoing burden to its Florida constitutional rights, and monetary damages.

<u>**COUNT XI**</u>

**Lack of Substantial Competent Evidence to Deny the 2024 Application**
*(against the County and the BCC)*

485.    Paragraphs 1 through 403 are incorporated by reference as if set forth fully herein.

486.    OTC is entitled to full review of Defendants' administrative action as a matter of right.

487.    Defendants' administrative findings and judgment denying the 2024 Application are not supported by competent substantial evidence.

488.    OTC's 2024 Application sought action that is consistent with the comprehensive plan and complies with all procedural requirements of the County zoning ordinance.

489.    Defendants failed to demonstrate that denial of the 2024 Application accomplishes a legitimate public purpose.

490.    Denial of the 2024 Application was arbitrary, discriminatory, and unreasonable.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff, Orlando Torah Center, Inc., respectfully requests that this Court grant the following relief:

a.    A declaration that LDC §§ 38-78 and 30-43, together with the provisions implementing the same, namely, the provisions of the Land Development Code regulating special exceptions described herein, are an unconstitutional prior restraint

under the First Amendment to the United States Constitution;

b.     A declaration that LDC § 38-1476, together with the provisions implementing the same, regulating off-street parking requirements described herein, is unconstitutional and illegal under the Free Exercise Clause of the First Amendment to the United States Constitution, the Religious Freedom provision of the Florida Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and RLUIPA's Equal Terms Provision;

c.     A declaration that Defendants' decisions on the 2024 Application are void, illegal, and unconstitutional on the ground that they violate the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1982, RLUIPA, FRFRA, and Article I, Section 3 of the Florida Constitution;

d.     An order reversing Defendants' decisions on the 2024 Application;

e.     An order directing Defendants to grant the 2024 Application;

f.     Preliminary and permanent orders enjoining Defendants, their officers, employees, agents, successors, and all others acting in concert with them from applying the land use regulations described above in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, RLUIPA, 42 U.S.C. § 1982, and state law, or undertaking any and all action in furtherance of such acts;

g.     An award of compensatory damages against Defendants in favor of

Plaintiff as the Court deems just for the loss of its rights under the First and Fourteenth Amendments to the United States Constitution, RLUIPA, 42 U.S.C. § 1982, FRFRA, and the Religious Freedom provision of the Florida Constitution incurred by Plaintiff and caused by Defendants' laws and by Defendants' actions in relation to the denial of the 2024 Application;

h. An award to Plaintiff pursuant to 42 U.S.C. § 1988, RLUIPA and FRFRA of full costs and attorneys' fees arising out of Defendants' actions, land use decisions and out of this litigation; and

i. Such other and further relief as this Court may deem just and appropriate.

Dated: July 31, 2025                    Respectfully submitted,

/s/ Jon M. Philipson
Jon M. Philipson, Esq.
*Lead Counsel*
Florida Bar No. 92960
Gregory L. Pierson, Esq.
Florida Bar No. 123905
**GUNSTER, YOAKLEY & STEWART, P.A.**
401 E. Jackson Street, Suite 1500
Tampa, Florida 33602
Tel: (813) 228-9080
Facsimile: (813) 228-6739
jphilipson@gunster.com
gpierson@gunster.com
tbacchus@gunster.com
cwarder@gunster.com

Joshua A. Levine, Esq.
Florida Bar No. 106072
**GUNSTER, YOAKLEY & STEWART, P.A.**
600 Brickell Avenue, Suite 3500
Miami, Florida 33131

Tel: (800) 615-1980
Facsimile: (305) 376-6010
jlevine@gunster.com
jandersondavis@gunster.com

Roman P. Storzer, Esq. (motion for special
admission forthcoming)
Blair Lazarus Storzer, Esq. (motion for
special admission forthcoming)
**STORZER & ASSOCIATES, P.C.**
1025 Connecticut Ave NW, Suite 1000
Washington, DC 20036
Tel: (202) 857-9766
Facsimile: (202) 315-3996
storzer@storzerlaw.com
bstorzer@storzerlaw.com
silverman@storzerlaw.com
filings@storzerlaw.com

***Attorneys for Orlando Torah Center, Inc.***